1
2
3
4                    UNITED STATES DISTRICT COURT
5                    NORTHERN DISTRICT OF CALIFORNIA
6
7    ROBERT TOBIAS ALVAREZ,              Case No.  21-cv-04626-HSG
                    Petitioner,
8
                                         ORDER DENYING PETITION FOR
9        v.                              WRIT OF HABEAS CORPUS;
                                         DENYING CERTIFICATE
10   JIM ROBERTSON,                      OFAPPEALABILITY
                    Respondent.
11
12           Before the Court is the petition for a writ of habeas corpus of Petitioner Robert Tobias

13   Alvarez, brought pursuant to 28 U.S.C. § 2254, challenging the validity of his state court

14   conviction.  (Dkt. No. 1.)  Respondent has filed an answer to the petition (Dkt. No. 11-1), and

15   Petitioner has filed a traverse (Dkt No. 13).  For the reasons set forth below, the petition is

16   DENIED.

17                    I.        PROCEDURAL HISTORY

18           In 2017, a Santa Clara County jury convicted Petitioner of first degree murder (Cal. Pen.

19   Code § 187) and three counts of robbery (Cal. Pen. Code § 211).  (Dkt No. 12-7 at 214-19.)  The

20   jury also found true the murder special circumstance allegation (Cal. Pen. Code § 190.2(a)(17)),

21   and criminal street gang allegations on the murder count and one robbery count (Cal. Pen. Code

22   §§ 186.22(b), (b)(1)(c)).  Id.  The trial court found true prior strike convictions.  (Id. at 221.)  The

23   trial court sentenced Petitioner to an aggregate term of life without parole plus fifty-six years to

24   life in prison.  (Id. at 261.)

25           Petitioner appealed his conviction to the California Court of Appeal.  On April 23, 2020,

26   the California Court of Appeal affirmed.  See People v. Alvarez, No. H045451, 2020 WL 1950872

27   (Cal. Ct. App. Apr. 23, 2020).  On July 8, 2020, the California Supreme Court summarily denied

28

United States District Court
Northern District of California

1   review.  (Dkt. No. 12-40 at 83.)

2       On June 16, 2021, Petitioner filed a federal habeas petition that commenced the instant

3   action.  (Dkt. No. 1.)

## II.    STATEMENT OF FACTS

The following factual background is taken from the April 23, 2020 opinion of the

California Court of Appeal.[1]

### 1. The Events of June 12 and 13, 2013

On the evening of June 12, 2013, sisters Cassandra Reyes and S.M. and their respective boyfriends, defendant and Christopher M., drove to a 7-Eleven in San Jose.  At that time, Reyes was 24 years old, S.M. was 16 years old, defendant was 21 years old, and Christopher was 17 years old.  Reyes drove the group in her mother's silver Cadillac.

Defendant and Christopher went into the 7-Eleven while the sisters waited in the car.  According to Reyes, defendant and Christopher returned with chips, soda, cans of Four Loko [FN], and beer.  Reyes knew defendant did not have the money to pay for the items and he confirmed to her that he "took" them.  Defendant told Reyes to drive to another 7-Eleven so they could get more beer.  She complied.  Again, defendant and Christopher went inside while Reyes and S.M. remained in the car.  Again, defendant and Christopher returned with beer and Four Loko and told Reyes to drive to another 7-Eleven.  Reyes testified that this pattern continued until they had gone to five or six different 7-Elevens.  S.M., who testified under a grant of immunity, likewise testified that she, her sister, defendant, and Christopher drove to multiple 7-Elevens; that at each store only Christopher and defendant went inside; and that each time they returned with Four Loko and beer.

Just before midnight, defendant and Christopher entered the 7-Eleven owned by Edward N.  According to the clerk on duty, R.P., one of the men picked out some beer while the other stood near the door.  When R.P. asked the men to pay, the one near the door cursed at him, displayed a 12-inch knife that was hanging by his belt, and threatened to kill R.P.  Edward, who was in the back of the store, heard shouting and came to the front.  He saw the men leave without paying for the beer.  Edward did not try to stop the men because, while he did not see the knife, he nevertheless believed intervening could be dangerous because there were two of them, they were cursing, and they might have been armed.  Outside, Edward saw the men get into a four-door gray Cadillac; he wrote down the license plate number and called the

---

[1] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. Daniel*, 853 F.3d 1049, 1052-54 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of the facts is supported by the record, and that this summary is therefore entitled to a presumption of correctness, unless otherwise indicated in this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

police.  The license plate number Edward provided to police was 5FLD322.  The license plate number on Reyes's mother's Cadillac was 5FLB932.  Surveillance video of the incident was played at trial.  It shows a male wearing a jersey with the number 18 on it holding a knife and another male holding beer.  S.M. testified that on the night of the 7-Eleven robberies, Christopher was wearing a jersey with the number 18 on it.

During the course of the night, defendant drank Four Loko and Christopher drank beer.  Both Reyes and S.M. testified that defendant drank at least five cans of Four Loko and became extremely drunk.  [FN] At one point, defendant opened the door of the car while it was moving at approximately 45 miles an hour and threatened to jump out because he wanted to "rob somebody."  Later, defendant said he had to go to the bathroom.  Reyes pulled onto Checkers Street to let him out of the vehicle.  Christopher got out too.

A couple of minutes later, Reyes heard yelling.  She drove down Checkers towards the noise.  She saw Christopher and defendant assaulting a man who was lying in the street.  Christopher was kicking the man and defendant was swinging his arms at the man.  When defendant got back in the front passenger seat of the Cadillac, he was holding a bloody knife.  Christopher got in the backseat.  Reyes testified that he too was holding a knife with blood on it.  S.M. denied seeing anything in Christopher's hands; she said that he started crying when he reentered the car.

According to Reyes, during the car ride home, defendant said "fucking scrap," "you bitches better not say anything [or] I'll hurt you," and "I came up."  S.M. likewise heard defendant threaten them but denied hearing the phrase "came up."  While they were still in the car, defendant showed Reyes a wallet, cell phone, car keys, and a checkbook.  Back at Reyes and S.M.'s house, defendant and Christopher washed the knives, removed their clothes and put them in black garbage bags, and attempted to burn the wallet, cell phone, car keys, and checkbook in the backyard.

The following day, Joel M. came to the house.  In Reyes's presence, defendant told Joel that he had stabbed somebody and that he needed Joel to get rid of the knife and gloves.  Reyes also saw defendant give Joel the bag of clothes and a knife, which Joel wrapped in one of Reyes's T-shirts.  Reyes then drove Joel to defendant's residence located at 70 South 21st Street in San Jose.

. . .

**[2]. The Investigation**

Police interviewed Joel on June 14, 2013.  That evening, officers searched defendant's residence.  In a fenced-in area along the driveway, they found a trash bag containing a knife wrapped in a shirt.  The knife had a 10-inch blade, which was partially serrated.  At trial, Reyes identified the knife as belonging to defendant.  On the deck of defendant's apartment, police found a trash bag containing a knife sheath, a melted blue cellphone, a partially burned checkbook bearing the names of G.O. and his wife, three gloves, and a partially burned

white wicker basket.

On June 15, 2013, police searched the house where Reyes and S.M. lived. They discovered burnt material in the backyard. In the ground floor bedroom, they found a dresser with wicker drawers, one of which was missing. The partially burned white wicker basket found at defendant's residence appeared to be the same size and shape as the remaining wicker drawers in the dresser.

Police obtained defendant's cell phone records, including his text messages, pursuant to a search warrant. Those records showed that defendant sent Joel the following three text messages on the afternoon of June 13, 2013: "Fuck, some shit happened, and I need you right now"; "K, fa sho, I need your assistance, bro"; and "Please don't flake on me, brother. I need your help. You my only hope at this time." Shortly after midnight on June 14, 2013, defendant texted Joel: "Good lookin' out bro. I appreciate your assistance."

Police took defendant, Christopher, and Reyes into custody on June 15, 2013.

**[3]. Forensic and DNA Evidence**

The knife found at defendant's residence had a string tied to the handle. DNA testing identified the victim as a possible contributor to DNA found on that string. The prosecution's DNA expert testified that the odds of obtaining the same DNA profile from a random person in the United States was "1 in 12 billion in the African American population, 1 in 28 billion in the Caucasian population, and 1 in 97 billion in the Hispanic population." While G.O. was Asian, the expert was unable to give a statistical probability for the Asian population due to the lack of an Asian population database. But he opined that the probability that a random individual would share the same DNA profile was at least 1 in 2 billion.

A bloodstain on the Cadillac's front passenger door handle contained G.O.'s DNA. G.O.'s DNA also was found on the front passenger seatbelt.

. . .

The cause of death was multiple blunt and sharp force injuries. Dr. Jorden opined that the head trauma alone "probably" would have rendered the victim "greatly incapacitated" and might have been fatal. She further opined that the stab wounds alone would have been fatal absent the head injury.

Dr. Jorden could not determine whether more than one knife inflicted the sharp force injuries because a serrated blade can inflict a wound without serrated margins. At trial, she was shown a picture of the knife found []at defendant's residence. She opined that it could have inflicted some or all of the stab wounds.

*Alvarez*, 2020 WL 1950872, at *1–4.

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div style="text-align:center">

### III.   DISCUSSION

#### A.   Standard of Review

</div>

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).[2]  In reviewing each claim,

---

[2] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default.  *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

<div style="text-align:center">

5

</div>

<div style="writing-mode:vertical">United States District Court<br>Northern District of California</div>

the court must examine the last reasoned state court decision that addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

When a federal claim has been presented to a state court and the state court has summarily denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)). Accordingly, in reviewing the habeas claims not addressed by the state appellate court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then gives deference to those arguments or theories under AEDPA. *Id.* at 102.

### B.    Petitioner's Claims

Petitioner raises the following eight claims for relief: (1) the trial court erred when it refused to allow into evidence co-defendant Christopher's admission to police that he had committed substantial portions of the charged crimes; (2) the trial court erred when it refused to allow cross-examination of S.M. regarding co-defendant Christopher's admission of guilt; (3) the prosecutor committed misconduct when he argued that Petitioner stabbed the victim; (4) insufficient evidence to support the conviction for robbery of Edward Ng; (5) insufficient evidence to support gang enhancements on the murder and robbery counts; (6) special circumstance conviction should be reversed; (7) Petitioner's sentence constituted cruel and unusual punishment within the meaning of the Eighth Amendment; and (8) cumulative error.

### 1.   Claim No. 1: Admission of Evidence

In Claim No. 1, Petitioner contends that the trial court erred when it excluded excerpts from co-defendant Christopher's statement to the police under the state hearsay exception for declarations against interest. The Supreme Court of California summarily denied this claim. The California Court of Appeal laid out the relevant background and rejected this claim as follows:

#### a. Christopher's Statement to Police

Police interviewed Christopher on June 15, 2013. His version of events changed dramatically over the course of the interview. He began by claiming that he and S.M. had stayed in on the night of the

robberies and the killing. Next, he admitted that he, S.M., Reyes, and defendant went out that night and that "a guy died." He explained that they "got beer" and were drinking and driving around until defendant said to stop the car. Christopher said that he and defendant got out of the car and that defendant stabbed a man. Christopher denied any involvement in the attack and denied that defendant kicked the victim. He said that defendant took the victim's wallet and phone and later burned them.

Police shifted gears, asking about how the group had obtained beer. Christopher claimed he stayed in the car while defendant went into a 7-Eleven. Later, Christopher admitted that he and defendant took beer from two 7-Elevens without paying. Eventually, Christopher acknowledged that they took beer from numerous 7-Elevens.

Upon further questioning about the stabbing, Christopher said that he and defendant got out of the car to go to the bathroom and the victim "was right there." Defendant approached the victim and asked for money, the victim ran, and defendant chased and stabbed him. Christopher maintained that he did not touch the victim. The detective told Christopher that "the house across the street had a camera" and that the video "shows more than [defendant stabbing the victim]. It wasn't just [the defendant]." [FN] Christopher responded by asking "What did I do?" Eventually, Christopher admitted that he had a knife but said that he did not stab the victim. Christopher said that he was the one who asked the victim, "What you got in your pockets?" He reiterated that the victim ran and defendant chased, stabbed, and robbed him. Christopher continued to deny that he hit or stabbed the victim. The detective again referenced the supposed video, saying "So you're telling me the video lied? The video was wrong?" After more back and forth, Christopher said that he hit the victim twice with his fist, but did not stab him.

> [FN] This apparently was a ruse; we are aware of no
> video of the stabbing.

In his next description of the incident, Christopher said that he swung his knife at the victim once but missed. Subsequently, he said that he stabbed the victim "[p]robably like two times," but denied that there was any blood on the knife when he got back in the car. Christopher then said that defendant stabbed his whole knife into the victim. Christopher told the detective that he felt like he had to stab the victim because defendant, who was drunk and had a knife, looked at him and asked "ain't you gonna do nothing?" Christopher told the detective that there were two knives, both of which belonged to defendant.

Next, the detective told Christopher that "[s]omebody hit [the victim] over the head with something." Christopher denied knowing anything about that or seeing defendant hit the victim over the head. The detective then told Christopher that "[s]omebody was kicking him in the head" and asked who it was. Christopher responded that defendant kicked the victim in the head after stabbing and robbing him.

Christopher described the incident a final time. He said that he and defendant got out of the car and went to the bathroom in a bush in

someone's front yard.  When they were done, they saw the victim and defendant suggested that they rob him.  They ran up to the victim.  Christopher said something and the victim tried to run away.  Defendant and Christopher chased him and "we stabbed him."  Defendant continued to stab the victim until Christopher told him to "chill."  Defendant then searched the victim's pockets.  Christopher started to walk away.  He looked back and saw defendant kicking the victim in the head "like ... [he] wanted to kill the guy."

**b. Motion to Introduce Excerpts of Christopher's Statement to Police**

Defendant sought to advance a defense that Christopher alone stabbed and killed G.O. [the victim].  In support of that defense, he moved under Evidence Code section 1230 to admit 19 excerpts of Christopher's statement to police in which Christopher incriminated himself.  Defendant maintained that the remainder of the statement, in which Christopher incriminated defendant, was inadmissible.  The prosecutor argued that Christopher's statements did not qualify for admission under Evidence Code section 1230.  The trial court agreed, characterizing the statement as a whole as "saying, 'I did it, but [defendant] is guiltier than I am.' "  The court excluded the evidence.

**c. The Trial Court Did Not Abuse its Discretion**

It is undisputed that Christopher was unavailable as a witness, as required by Evidence Code section 1230, having exercised his Fifth Amendment right not to incriminate himself.  At issue is whether Christopher's statements to police were against his penal interest at the time they were made.

Defendant argues that the excerpts he sought to admit were "totally against [Christopher's] interest.  They said nothing about [defendant]."  That argument ignores our Supreme Court's guidance that "context matters in determining whether a statement or portion thereof is admissible under the against-interest exception." (*Grimes*, *supra*, 1 Cal.5th at p. 717.)  Indeed, "a hearsay statement that is facially inculpatory of the declarant may, when considered in context, also be exculpatory or have a net exculpatory effect."  (*People v. Duarte* (2000) 24 Cal.4th 603, 612 (*Duarte*).)  For example, context may reveal a facially inculpatory statement to be an attempt to " 'shift blame or curry favor' " with the authorities.  (*Ibid.*)

The trial court did not abuse its discretion by concluding that, in context, Christopher's statements were not "truly self-inculpatory, [but] rather ... attempts to shift blame or curry favor" with police. (*Williamson v. United States* (1994) 512 U.S. 594, 603.)  Christopher incriminated himself only after the detective employed a ruse designed to make him believe that police already had sufficient evidence to link him to the murder and robbery of G.O.  And, as defendant himself acknowledges in his opening brief, even after admitting culpability, "[Christopher] continued to claim that [defendant] was mostly responsible."  Christopher "may have believed ... he had little to lose and perhaps something to gain by admitting his role while attempting to minimize his participation and shift primary responsibility to [defendant]." (*Duarte*, *supra*, 24

Cal.4th at p. 617; *see* Advisory Committee Notes to Fed. Rules Evid., rule 8045 ["a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest"].)

On reply, defendant offers a new interpretation of Christopher's statement. He says that, by the end of the interview, Christopher "effectively recanted all his earlier accusations that [defendant] did any stabbing" and "effectively admitted that he[, Christopher,] was the one holding the knife." We disagree with that characterization of Christopher's police statement. In Christopher's final version of events, it was defendant's idea to rob the victim; they both chased and stabbed the victim; defendant continued to stab the victim after Christopher stopped and until Christopher told him to "chill"; defendant went through the victim's pockets; and defendant kicked the victim in the head.

*Alvarez*, 2020 WL 1950872, at *7-9.

The state court's rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). In limited circumstances, however, the exclusion of crucial evidence may violate the Constitution. *See Holmes v. South Carolina*, 547 U.S. 319, 319 (2006) ("[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense") (citations and internal quotations omitted); *Chia v. Cambra*, 360 F.3d 997, 1003 (9th Cir. 2004) ("The Supreme Court has made it clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense.") (citations and internal quotations omitted). Nevertheless,

[w]hile the Constitution [ ] prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Holmes*, 547 U.S. at 326.

United States District Court
Northern District of California

As indicated by the state appellate court, the trial court excluded Christopher's statement pursuant to the court's discretion under California Evidence Code 1230, which recognizes a hearsay exception for a declaration against penal interest.  *See People v. Gordon*, 50 Cal.3d 1223, 1251 (1990) (holding that hearsay exception for declaration against interest "requires the court to apply [] the peculiar facts of the individual case . . .[which] demands, the exercise of discretion") (overruled on other grounds).  There is no Supreme Court precedent establishing a right to federal habeas relief based on the exclusion of evidence pursuant to discretionary state evidentiary rules. *See Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (noting that the Supreme Court has not squarely addressed the discretionary exclusion of evidence and the right to present a complete defense).

Further, the state court's determination that Christopher's statement to the police did not fall within the hearsay exception was not unreasonable.  Petitioner wished to introduce Christopher's statements to support the defense theory that Christopher alone killed the victim.  However, in Christopher's statement to the detectives he repeatedly implicated Petitioner in the crime and denied his own involvement.  For much of the statement, Christopher emphasized that Petitioner alone chased and stabbed the victim and that he merely observed the stabbing.  (Dkt. No. 12-8 at 138, 158, 164-65, 174-83.)  Even after Christopher admitted that he "probably" stabbed the victim, he explained that he was pressured by Petitioner and emphasized that Petitioner was primarily responsible.  (*Id*. at 200-01, 218-19.)  Given Christopher's many inconsistent and shifting statements, the trial court was not unreasonable in concluding that Christopher's statement was not against his penal interest.  Because the state court's decision rejecting this claim does not amount to an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts, Claim No. 1 is denied.

### 2.  Limit on Cross-Examination

In Claim No. 2, Petitioner argues that the trial court erred when it excluded an excerpt from a recorded conversation between Christopher and S.M.  During cross-examination of S.M., defense counsel sought to elicit testimony regarding a conversation Christopher had with S.M. at the police station.  (Dkt. No. 12-21 at 48-50.)  Later, outside the presence of the jury, defense

counsel explained: "what I wanted to do was bring in the full context of the statement, which is that she [S.M.] said to Christopher, 'I told them that you didn't do it and you say you did.'  And he says, 'Yeah.'  And she says, 'Fucking loser.'"  (*Id.* at 192.)  The state objected to the conversation being admitted on grounds that it was both hearsay and ambiguous:

> [A]lso . . . in terms of when [S.M.] and [] Christopher[] had that conversation, the Court has looked at the entire interview.  They had that conversation before [Christopher] ever admitted to knifing someone.  So, in other words, that—whatever he was saying was very ambiguous and up until that point, he never admitted his involvement.  So even hypothetically if that statement were to come in, it's misleading to the jury because up to that point, he had not told officers he had a knife.

(*Id.* at 193-94.)

The trial court excluded the statement, explaining:

> Agreed.  And the Court has no knowledge and clearly the jury has no knowledge of whatever it was that she thinks she told the police.  And what we've certainly learned from her testimony is that [S.M.] summarizes things that then need to be explored in great detail by each of you.  So I don't know really what she was saying to Mr. Christopher[.]

(*Id.* at 194.)

The Supreme Court of California summarily denied Petitioner's claim that the trial court erred in excluding S.M. and Christopher's statement.  The California Court of Appeal rejected this claim as follows:

> At the same time police interviewed Christopher, they also separately interviewed S.M.  In the middle of Christopher's interview, police allowed Christopher and S.M. to talk alone in an interview room.  Prior to speaking with S.M., Christopher had admitted to stealing beer from two 7-Elevens but had not made any inculpatory statements about the stabbing and robbery of G.O.  The conversation between Christopher and S.M. was recorded.  During that conversation, S.M. said to Christopher: "I told them that you didn't do it and you said you did."  Christopher responded, "yeah."  The remainder of their conversation is not in the record. [FN]
>
> > [FN] The parties do not direct us to any transcript of the recorded conversation in the record and we have not found one.  We rely on defense counsel's in-court recitation of the relevant statements, as do the parties on appeal.  Defense counsel described the statements outside the presence of the jury while memorializing for the record a prior exchange among defense counsel, the prosecutor, and the trial court during a

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

side bar.

> Defense counsel sought to introduce S.M.'s statement and Christopher's response under Evidence Code section 1230. The trial court excluded those statements. Defendant says that was error because Christopher's statement that "yeah" he "did it" was a declaration against penal interest.

> The trial court did not abuse its discretion in concluding otherwise. As noted, " '[w]hether a statement is self-inculpatory or not can only be determined by viewing the statement in context.' " (*Grimes*, *supra*, 1 Cal.5th at p. 716.) Here, we do not have the requisite context. The statement itself—apparently confirming that Christopher told police he did "it"—is vague. The entirety of the conversation, which might elucidate the meaning of "it," is not in the record. Given the facts of the case, "it" could refer to any number of criminal or noncriminal acts. In short, the trial court did not abuse its discretion in concluding that defendant failed to carry his burden of showing that the declaration was against Christopher's penal interest.

*Alvarez*, 2020 WL 1950872, at *9.

The state court's determination that the conversation between S.M. and Christopher did not fall within the hearsay exception was not unreasonable. First, as previously explained, there is no Supreme Court case which provides habeas relief based on the exclusion of evidence pursuant to discretionary state evidentiary rules. *See Horell*, 644 F.3d at 983. Second, while a state court may not exclude evidence "under rules that serve no legitimate purpose," trial judges may "exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326. Here, the record is clear that presenting the jury with the limited statements from S.M.'s conversation with Christopher consisting of "I told them that you didn't do it and you say you did" and "Yeah," had the potential to mislead the jury. As noted by the state court, those statements were made in the middle of Christopher's lengthy confession to the detectives. Because it is not clear which, if any, crimes the statements refer to, the state court was not unreasonable in concluding that Petitioner failed to show they were against Christopher's penal interest. The state court's decision rejecting this claim was not an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts. Petitioner is denied relief on Claim No. 2.

### 3. Prosecutorial Misconduct

In Claim No. 3, Petitioner argues that the prosecutor committed misconduct at summation

by arguing that Petitioner alone stabbed the victim "which the prosecutor knew was factually incorrect." (Dkt. No. 1 at 31.)  The Supreme Court of California summarily denied this claim.  The California Court of Appeal rejected this claim as follows:

> Defendant contends the prosecutor committed misconduct in his closing argument by knowingly arguing a false inference—namely, that only defendant, and not Christopher, stabbed G.O.  Defendant says Christopher's excluded police statement, of which the prosecutor was aware, shows that inference to be false.  Defendant concedes he did not object below and says that if that failure to object forfeited the claim, then trial counsel was ineffective in failing to object.  We conclude that defendant suffered no prejudice, which defeats his claim regardless of the outcome of the forfeiture analysis.

> **1. Factual Background**

> In closing, the prosecutor argued: "What happens next is that the assault occurs, the victim goes down to the ground. Christopher ... is kicking the victim.  The defendant is punching the victim, which we now know is stabbing the victim."  Defense counsel did not object.  Elsewhere in his closing argument, the prosecutor twice argued that jurors could conclude that defendant stabbed the victim "three times or six times," based on the medical examiner's testimony that there were six knife wounds, three of which were serrated.

> **2. Legal Standards**

> **a. Prosecutorial Misconduct**

> " 'The applicable federal and state standards regarding prosecutorial misconduct are well established.' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.)  " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Gonzales* and *Soliz* (2011) 52 Cal.4th 254, 305.)

> "[T]he prosecution has broad discretion to state its views regarding which reasonable inferences may or may not be drawn from the evidence." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)  "The prosecutor, however, may not mislead the jury," including by asking "the jurors to draw an inference that they might not have drawn if they had heard ... evidence the judge had excluded." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757-758; *see United States v. Reyes* (9th Cir. 2011) 660 F.3d 454, 462 [" 'it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt ....' "].)

> "A defendant must timely object and request a curative instruction in order to preserve a claim of prosecutorial misconduct." (*People v.*

*Monterroso* (2004) 34 Cal.4th 743, 785.)

Prosecutorial "[m]isconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127 [applying the standard for prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) ].)

**b. Ineffective Assistance of Counsel**

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (Strickland).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." (*Id.* at p. 688.) With respect to prejudice, a defendant must show "there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." (*Id.* at p. 697.)

**3. Analysis**

Taken as a whole, the prosecutor's closing argument invited jurors to infer that defendant inflicted some or all of the victim's stab wounds. We are not convinced that the prosecutor knew an inference that defendant was the sole stabber to be false. While it is true that Christopher admitted to "probably" stabbing the victim twice, the veracity of that admission could reasonably be doubted. But we need not decide whether the prosecutor committed misconduct because even if he did, defendant suffered no prejudice. The jury found not true the allegation that defendant used a knife in the commission of the crimes against G.O. From that finding, we can deduce that jurors either concluded that Christopher was the sole stabber or were unable to unanimously agree as to whether defendant inflicted any of the stab wounds. In any event, the jury did not infer that defendant was the sole stabber. That is, to the extent the prosecutor encouraged jurors to make a potentially incorrect inference, they did not do so. In these circumstances, it is not reasonably probable that a result more favorable to the defendant would have been reached absent any suggestion by the prosecutor that defendant was the sole stabber. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Accordingly, if the prosecutorial misconduct claim was preserved, any misconduct does not merit reversal. And, if it was not, the ineffective assistance of counsel claim fails for lack of prejudice. (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [the *Watson* standard is

"substantially the same as the prejudice prong of *Strickland*"].)
*Alvarez*, 2020 WL 1950872, at *9-11.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995).  In determining whether improper prosecutorial statements rise to the level of a due process violation, the factors to consider are:

> the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and whether defense counsel had an adequate opportunity to rebut the comment[.]

*Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010) (referencing *Darden*, 477 U.S. 168 (1986)). "In essence, what *Darden* requires reviewing courts to consider appears to be equivalent to evaluating whether there was a 'reasonable probability' of a different result."  *Id*. at 914-15.

Under federal law, "a prosecutor may not express his opinion of the defendant's guilt" but, on the other hand, "the prosecution must have reasonable latitude to fashion closing arguments." *United States v. Moreland*, 622 F.3d 1147, 1161 (9th Cir. 2010).  Therefore, it is within the bounds of fair advocacy for a prosecutor to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true.  *See United States v. Blueford*, 312 F.3d 968, 968 (9th Cir. 2002).

Petitioner fails to prove there is a reasonable probability that the prosecutor's statement rendered the trial fundamentally unfair.  *See Ford v. Peery*, 999 F.3d 1214, 1225 (9th Cir. 2021). First, as the state court noted, the jury found the knife enhancement on the murder count not true. (Dkt. No. 12-7 at 214.)  Thus, to the extent the prosecutor urged the jury to make an arguably improper inference, *i.e.*, that Petitioner alone stabbed the victim, the jury rejected that inference. Second, because the evidence against Petitioner was strong, consisting of the testimony of Cassandra, S.M., various officers and forensic experts, it is not reasonably probable that the result

15

1   would have been different absent the prosecutor's statements about the knife on summation.  For

2   these reasons, habeas relief is denied on Claim No. 3.

3       **4.   Sufficiency of the Evidence: Robbery**

4         In Claim No. 4, Petitioner argues that there was insufficient evidence to support the

5   conviction for robbery of 7-11 manager Edward NG, because the evidence at trial did not show

6   that force or fear was used in the commission of the crime.  (Dkt. No. 1 at 33.)  The Supreme

7   Court of California summarily denied this claim.  The California Court of Appeal rejected this

8   claim as follows:

9         **1.   Standard of Review**

10  "[W]e review the whole record in the light most favorable to the
    judgment below to determine whether it discloses substantial

11  evidence—that is, evidence which is reasonable, credible, and of solid
    value—such that a reasonable trier of fact could find the defendant

12  guilty beyond a reasonable doubt."  (*People v. Cortes* (1999) 71
    Cal.App.4th 62, 71.)  "In making this determination, we do not

13  reweigh the evidence, resolve conflicts in the evidence, or reevaluate
    the credibility of witnesses."  (*Ibid.*)

14

15  **2. Count 4**

16  Defendant says there was insufficient evidence to support his
    conviction for robbing Edward, the 7-Eleven owner, because Edward

17  did not see the knife during the robbery and there was no other
    evidence of the use of force or fear.

18        **a. Legal Principles**

19  "Robbery is the felonious taking of personal property in the

20  possession of another, from his person or immediate presence, and
    against his will, accomplished by means of force or fear."  (§ 211.)

21  "The crime is essentially a theft with two aggravating factors, that is,
    a taking (1) from victim's person or immediate presence, and (2)

22  accomplished by the use of force or fear."  (*Miller v. Superior Court*
    (2004) 115 Cal.App.4th 216, 221.)

23  "The fear mentioned in Section 211 may be either: [¶] 1. The fear of
    an unlawful injury to the person or property of the person robbed, or

24  of any relative of his or member of his family; or, [¶] 2. The fear of
    an immediate and unlawful injury to the person or property of anyone

25  in the company of the person robbed at the time of the robbery."  (§
    212.)  " 'To establish a robbery was committed by means of fear, the

26  prosecution "must present evidence '... that the victim was in fact
    afraid, and that such fear allowed the crime to be accomplished.' " '

27  [Citation.]  Thus, the fear element is subjective in nature.  [Citation.]
    However, the victim need not explicitly testify that he or she was

28  afraid of injury where there is evidence from which it can be inferred

that the victim was in fact afraid of injury. [Citation.] 'The fear is sufficient if it facilitated the defendant's taking of the property. Thus, any intimidation, even without threats, may be sufficient. [Citations.]' " (*People v. Montalvo* (2019) 36 Cal.App.5th 597, 612.) "All that is necessary is that the record show ' " 'conduct, words, or circumstances reasonably calculated to produce fear....' " ' [Citation.]" (*People v. Morehead* (2011) 191 Cal.App.4th 765, 775.)

### b. Analysis

Edward testified that he did not try to stop defendant and Christopher from leaving with the stolen beer because it was dangerous given that there were two of them, they were cursing, and they might have been armed. Reasonable jurors could have inferred from Edward's testimony that he viewed defendant and Christopher's verbal aggression as carrying an implicit threat of harm if he resisted. Such jurors further could have inferred that Edward was afraid of being injured and that he did not try to regain the beer because of that fear. Thus, there was sufficient evidence that defendant and Christopher's conduct (e.g., cursing and working as a team) was reasonably calculated to produce fear, that Edward was afraid, and that such fear allowed the crime to be accomplished.

*Alvarez*, 2020 WL 1950872, at *12.

Evidence is constitutionally sufficient to support a conviction when, upon "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis excluded). The reviewing court must presume the trier of fact resolved any conflicts in the evidence in favor of the prosecution and must defer to that resolution. *Id.* at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 319). The only question is "whether the finding was so insupportable as to fall below the threshold of bare rationality." *Id.* at 656. The jury, not the court, decides what conclusions should be drawn from evidence admitted at trial. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). The jury's credibility determinations are, therefore, entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

As noted by the state court, under California law, robbery is the taking of property accomplished by force or fear. Cal. Pen. Code § 211. The taking of property "includes forcing or frightening a victim into leaving the scene, as well as simply deterring a victim from preventing

1    the theft or attempting to immediately reclaim the property." *People v. Flynn*, 77 Cal. App. 4th

2    766, 771 (2000) (citation omitted).  The "requisite fear need not be the result of an express threat .

3    . . . The use of force or fear to escape or otherwise retain even temporary possession of the

4    property constitutes robbery." *Id.* at 771-72.

5         The state court's determination that a rational jury could find the element of force or fear

6    was met as to the robbery of Ng's 7-Eleven was not unreasonable.  The cashier testified that after

7    asking Petitioner and Christopher to pay for the beer, he was called a "mother F-word" and one of

8    the men threatened to kill the cashier and took out a knife. (Dkt. No. 12-23 at 34-35.)  Ng, the

9    store owner, testified that after he heard shouting and cursing, he came out from the back of the

10   store and saw two men shouting and cursing at his clerk.  (Dkt. No. 12-21 at 147-48.)  Ng testified

11   that one of the men had a knife and the other was holding the beer.  (*Id.* at 148.)  He explained that

12   he did not try to stop them from leaving because it is "dangerous . . . [u]sually people that don't

13   pay for the beer will not really pay for it no matter, and I saw the weapons" and because "there

14   were two of them."  (*Id.* at 151.)  Based on this testimony, there was evidence showing that Ng

15   feared stopping Petitioner and Christopher from taking the beer.  Petitioner and Christopher were

16   shouting and cursing and at least one of the men had a knife.  Viewing the evidence in the light

17   most favorable to the prosecution, it was not unreasonable for the state appellate court to conclude

18   that there was sufficient evidence to support the robbery conviction of Ng beyond a reasonable

19   doubt.  *See, e.g.*, *People v. Morehead*, 191 Cal. App. 4th 765, 775 (2011) (explaining that

20   intimidation is sufficient to satisfy the element of "fear"); *Flynn*, 77 Cal. App. 4th at 771 ("rather

21   polite . . . tap of cashier sufficient where it caused cashier to fear defendant might be armed")

22   (citation omitted).

23              **5.  Sufficiency of the Evidence: Gang Enhancement**

24        In Claim No. 5, Petitioner contends that there was insufficient evidence to support the gang

25   enhancements on the murder and robbery convictions.  (Dkt. No. 1 at 36.)  Specifically, he argues

26   that because the "predicate acts" evidence of the gang enhancements was proven with his juvenile

27   adjudications, which are not found by a jury, that evidence violated *Apprendi v. New Jersey*, 530

28   U.S. 466 (2000).  (*Id.*)  The Supreme Court of California summarily denied this claim.  The

United States District Court
Northern District of California

18

1    California Court of Appeal rejected this claim as follows:

2         Jurors found true the allegations that defendant carried out the murder
3         and robbery of G.O. for the benefit of, at the direction of, or in
          association with a criminal street gang, with the specific intent to
4         promote, further, or assist in any criminal conduct by gang members
          (§ 186.22, subd. (b)(5)).  Defendant challenges those true findings as
5         unsupported by sufficient evidence.

6         . . .

7         The section 186.22, subdivision (b) gang sentence enhancement
          applies where the prosecution proves two things: (1) the underlying
8         crime was "committed for the benefit of, at the direction of, or in
          association with any criminal street gang" and (2) the underlying
9         crime was committed "with the specific intent to promote, further, or
          assist in any criminal conduct by gang members ...." (§ 186.22, subd.
10        (b).)  We shall refer to the first prong as "the gang-related prong" and
          the second prong as "the specific intent prong."  (*People v. Rios*
11        (2013) 222 Cal.App.4th 542, 564.)  Defendant contends there was
          insufficient evidence as to the gang-related prong.

12        Section 186.22 defines a "criminal street gang" as "any ongoing
          organization, association, or group of three or more persons, whether
13        formal or informal, having as one of its primary activities the
          commission" of one or more enumerated offenses, "having a common
14        name or common identifying sign or symbol, and whose members
          individually or collectively engage in or have engaged in a pattern of
15        criminal gang activity." (§ 186.22, subd. (f).)  Section 186.22 defines
          the phrase "pattern of criminal gang activity" to mean "the
16        commission of, attempted commission of, conspiracy to commit, or
          solicitation of, sustained juvenile petition for, or conviction of two or
17        more" predicate offenses by two or more persons on separate
          occasions within certain time periods.   (§ 186.22, subd. (e).)
18        Defendant maintains there was insufficient evidence of the existence
          of a criminal street gang because all the predicate offenses were
19        committed by juveniles, which he maintains violates his Sixth
          Amendment right to a jury's determination of every fact necessary to
20        his guilt, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466
          (*Apprendi*).
21
22        . . .

23        Section 186.22, subdivision (e) expressly provides that "sustained
          juvenile petition[s]" constitute evidence of predicate offenses for
24        purposes of establishing the requisite pattern of criminal gang
          activity.   The prosecutor introduced the following evidence to
25        establish a pattern of criminal gang activity: (1) Christopher's
          juvenile adjudication for assault by means likely to produce great
26        bodily injury (§ 245, subd. (a)(4)); (2) defendant's juvenile
          adjudication for assault on a peace officer by means likely to produce
27        great bodily injury (§ 245, subd. (c)); (3) defendant's juvenile
          adjudication for robbery (§ 211); and (4) defendant's juvenile
28        adjudication for vehicle theft (Veh. Code, § 10851, subd. (a)).

1
2
3
4
5

Defendant contends that the use of juvenile adjudications as predicate offenses violates *Apprendi*.  There, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.)  Defendant maintains that a juvenile adjudication is not a "prior conviction," for *Apprendi* purposes, because there is no right to a jury trial in juvenile court proceedings.

6
7
8
9
10
11
12
13
14
15
16
17
18
19

As defendant acknowledges, our Supreme Court has held that "*Apprendi* does not bar the use of a constitutionally valid, fair, and reliable prior adjudication of criminal conduct to enhance a subsequent adult sentence simply because the prior proceeding did not include the right to a jury trial." (*People v. Nguyen* (2009) 46 Cal.4th 1007, 1025 [considering the use of juvenile adjudications as strikes under the Three Strikes law].)  A majority of the federal circuits likewise has concluded that *Apprendi* does not bar the use of a juvenile adjudication to enhance a sentence, reasoning that juvenile adjudications provide sufficient procedural safeguards to ensure the reliability that *Apprendi* requires.  (*See United States v. Jones* (3d Cir. 2003) 332 F.3d 688, 696; *United States v. Wright* (4th Cir. 2010) 594 F.3d 259, 264; *United States v. Crowell* (6th Cir. 2007) 493 F. 3d 744, 750; *Welch v. United States* (7th Cir. 2010) 604 F.3d 408, 426; *United States v. Smalley* (8th Cir. 2002) 294 F.3d 1030, 1033; *United States v. Burge* (11th Cir. 2005) 407 F.3d 1183, 1191.)  The Ninth Circuit alone has concluded that "*Apprendi*'s narrow 'prior conviction' exception is limited to prior convictions resulting from proceedings that afforded the procedural necessities of a jury trial and proof beyond a reasonable doubt," such that it "does not include nonjury juvenile adjudications." (*United States v. Tighe* (9th Cir. 2001) 266 F.3d 1187, 1194-1195, fn. omitted.)  *Nguyen*, which is binding on this court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), compels us to reject defendant's contention that *Apprendi* bars the use of juvenile adjudications as predicate offenses for purposes of proving the gang enhancements.

20

*Alvarez*, 2020 WL 1950872, at *13-15.

21
22

As noted by the state appellate court, the Ninth Circuit held in *United States v. Tighe*, 266 F.3d 1187 (9th Cir. 2001), that the use of a non-jury juvenile adjudication to increase a criminal

23

penalty beyond the statutory maximum violates *Apprendi*.  *See Tighe*, 266 F.3d at 1194-95.

24

However, the Ninth Circuit has since rejected the idea that *Tighe* is clearly established federal law

25

under 28 U.S.C. § 2254(d):

26
27
28

We have already determined that our holding in *Tighe* is not clearly established Federal law for AEDPA purposes.  *See Boyd v. Newland*, 467 F.3d 1139, 1152 (9th Cir.2006).  *Boyd* noted that *Tighe* had been rejected not only by the California courts, but also by the Third, Eighth, and Eleventh Circuits.  *See id.*  We concluded that, "in the face of authority that is directly contrary to *Tighe*, and in the absence

20

> of explicit direction from the Supreme Court, we cannot hold that the
> California courts' use of Petitioner's juvenile adjudication as a
> sentencing enhancement was contrary to, or involved an unreasonable
> application of," clearly established Supreme Court precedent. *Id.*

*John-Charles v. California*, 646 F.3d 1243, 1252-53 (9th Cir. 2011). Given the lack of United

States Supreme Court authority on point, the state court's determination that there was sufficient

evidence to prove the gang enhancement with Petitioner's juvenile adjudications was not contrary

to or an unreasonable application of clearly established Supreme Court precedent. Habeas relief is

denied on Claim No. 5.

### 6. Constitutionality of Special Circumstance Felony Murder

In Claim No. 6, Petitioner argues that the special circumstance conviction should be

reversed based on the passage of Senate Bill 1437. The Supreme Court of California summarily

denied this claim. The California Court of Appeal rejected this claim as follows:

> Defendant next challenges the constitutionality of the felony-murder
> special circumstance. He contends that recent changes to the felony-
> murder rule eliminated any distinction between the felony-murder
> special circumstance and the felony-murder offense for nonkiller
> accomplices. In his view, the absence of any distinction between the
> two means that the felony-murder special circumstance no longer
> performs the constitutionally required narrowing of death-eligible
> murders.
>
> **1. Legal Principles**
>
> **a. Eighth Amendment Narrowing of Death-Eligible Murders and
> the Felony-Murder Special Circumstance**
>
> "The Eighth Amendment to the United States Constitution, which
> prohibits the infliction of 'cruel and unusual punishments,' imposes
> various restrictions on the use of the death penalty as a punishment
> for crime. One such restriction is that any legislative scheme defining
> criminal conduct for which death is the prescribed penalty must
> include some narrowing principle that channels jury discretion and
> provides a principled way to distinguish those cases in which the
> death penalty is imposed from the many cases in which it is not. A
> death-eligibility criterion that fails to meet this standard is deemed
> impermissibly vague under the Eighth Amendment." (*People v.
> Bacigalupo* (1993) 6 Cal.4th 457, 462.) In California, "special
> circumstances" set forth in section 190.2 perform the constitutionally
> required "narrowing" function. (*Bacigalupo*, *supra*, at p. 468.)
>
> One such special circumstance is the felony-murder special
> circumstance set forth in section 190.2, subdivision (a)(17). It applies
> where the murder "was committed while the defendant was engaged
> in, or was an accomplice in, the commission of, attempted

commission of, or the immediate flight after committing, or attempting to commit" one of various enumerated felonies (§ 190.2, subd. (a)(17)), including robbery (§ 190.2, subd. (a)(17)(A)).  The felony-murder special circumstance applies to a nonkiller only if he or she "aid[ed], abet[ted], counsel[ed], command[ed], induce[d], solicit[ed], request[ed], or assist[ed] ... in the commission of murder" "with the intent to kill" (§ 190.2, subd. (c)), or he or she "aid[ed], abet[ted], counsel[ed], command[ed], induce[d], solicit[ed], request[ed], or assist[ed] in the commission of [the underlying] felony" "with reckless indifference to human life and as a major participant ..." (§ 190.2, subd. (d)).

**b. Felony Murder**

Prior to 2019, section 189 defined first degree felony murder as "[a]ll murder ... which is committed in the perpetration of, or attempt to perpetrate" certain enumerated felonies including robbery.  (Stats. 2010, ch. 178, § 51.)  "The mental state required [was] simply the specific intent to commit the underlying felony ...." (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)  Under the felony murder rule as stated in former section 189, "[l]iability for felony murder ... extend[ed] to [nonkiller accomplices] who knowingly and purposefully participate[d] in the underlying felony even if they [took] no part in the actual killing." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1159.)

Senate Bill 1437, which became effective on January 1, 2019, "was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)  Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability.  Senate Bill 1437 also adds ... section 1170.95, which allows those 'convicted of felony murder or murder under a natural and probable consequences theory ... [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts ....' (§ 1170.95, subd. (a).)"  (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)

Following the enactment of Senate Bill 1437, section 189 continues to define first degree felony murder as "[a]ll murder ... that is committed in the perpetration of, or attempt to perpetrate" certain enumerated felonies including robbery.  (§ 189, subd. (a).)  Newly added section 189, subdivision (e) now limits liability for felony murder to: (1) actual killers; (2) nonkillers who, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree"; and (3) nonkillers who were "major participant[s] in the underlying felon[ies] and acted with reckless indifference to human life ...."

**c. Nature of the Challenge**

In this case, the government did not seek the death penalty, and defendant was not sentenced to death. Accordingly, he lacks standing to assert an Eighth Amendment challenge to the felony murder special circumstance. (*Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907.) Instead, he asserts a vagueness challenge under the Due Process Clause. "Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." (*Maynard v. Cartwright* (1988) 486 U.S. 356, 361; *see People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 309 [same].)

**2. Analysis**

Before Senate Bill 1437, a nonkiller accomplice could be guilty of murder under the felony-murder doctrine even if he or she neither acted with intent to kill nor was a major participant in the underlying felony who acted with reckless indifference to human life. And only a subset of nonkillers convicted of felony murder was death eligible—namely, those who acted with intent to kill and those who were major participants in the underlying felony who acted with reckless indifference to human life. After Senate Bill 1437, a nonkiller accomplice can be guilty of felony murder only if he or she either acted with intent to kill or was a major participant in the underlying felony who acted with reckless indifference to human life. According to defendant, all nonkillers convicted of felony murder are now death eligible. In his view, it follows that the felony-murder special circumstance no longer narrows the class of people eligible for the death penalty. We reject defendant's claim for the following reasons.

> [FN 7] We express no opinion as to the retroactivity of Senate Bill No. 1437, an issue that was not briefed by the Attorney General and that is currently pending before the California Supreme Court. . . .

Defendant's challenge rests on the premise that a special circumstance that duplicates the underlying theory of murder is unconstitutional. Precedent from both the United States Supreme Court and the California Supreme Court compels us to reject that premise as flawed. State death penalty laws must narrow the class of death-eligible defendants from "every defendant convicted of a murder ... to [some] subclass [or subclasses] of defendants convicted of murder." (*Tuilaepa v. California* (1994) 512 U.S. 967, 972.) The section 190.2 special circumstances do just that. Section 190.2, subdivision (a)(17) in particular accomplishes the required narrowing, as not every defendant convicted of murder is convicted of felony murder. Defendant suggests that the constitution compels a further narrowing of death-eligible defendants based on the underlying theory of murder. That is, in his view, it is unconstitutional for all defendants convicted under a particular theory of murder to be death eligible. But no such additional narrowing requirement exists. Indeed, the Supreme Court rejected a similar argument in *Lowenfield v. Phelps* (1988) 484 U.S. 231. There, the

United States District Court
Northern District of California

court considered the constitutionality of Louisiana's capital sentencing scheme, under which an individual found guilty of first degree murder was eligible for the death penalty only if the jury found at least one statutory aggravating circumstance existed. (*Id*. at p. 242.)   In *Lowenfield*, the jury found a single aggravating circumstance, which "duplicated one of the elements of the [underlying] crime" of first degree murder. (*Id*. at p. 246.) The Supreme Court concluded that the scheme was constitutional despite that duplication.

California courts have relied on *Lowenfield* to hold that it is not unconstitutional for a special circumstance to duplicate elements of the conviction offense. (*See People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164 [citing *Lowenfield* for the proposition that defendant's suggestion "that section 190.2(a)(21) contains a constitutional infirmity simply because it duplicates the elements which defined defendant's murder as ... first degree murder ... has already been decided to have no merit"]; *People v. Catlin* (2001) 26 Cal.4th 81, 158 ["first degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment"]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1023, fn. 12 ["We do not understand defendant to contend that the lying-in-wait special circumstance is constitutionally infirm because it duplicates an element of first degree murder. As defendant no doubt recognizes, a contention to this effect would be meritless," citing *Lowenfield*].)   We similarly conclude that, assuming section 190.2, subdivision (a)(17) duplicates the elements of felony murder for nonkiller accomplices, that duplication does not render it unconstitutional. (*See People v. Johnson* (2016) 62 Cal.4th 600, 636 [if lying-in-wait special circumstance were "identical to lying-in-wait first degree murder," it nevertheless "would satisfy federal constitutional requirements for death eligibility"].)

*Alvarez*, 2020 WL 1950872, at *15-17.

Petitioner is not entitled to relief on this claim.  First, the California Supreme Court has held that Senate Bill (SB) 1437 "does not apply retroactively to nonfinal judgments on direct appeal." *People v. Gentile*, 10 Cal. 5th 830, 852 (2020).  Instead, a conviction may only be challenged based on SB 1437 "through a petition filed in the sentencing court under section 1170.95." *Id.* Here, at the time SB 1437 became effective on January 1, 2019, Petitioner's direct appeal was not final. (*See* Dkt. Nos. 12-37 & 12-39.)  Thus, Petitioner cannot appropriately raise a challenge to SB 1437 here.  Instead, he must do so by filing a petition under "section 1170.95 [which] is the exclusive mechanism for retroactive relief." *Id*. at 839.

Second, Petitioner's challenge to SB 1437 must be denied because it is not unconstitutional for a special circumstance to duplicate elements of the conviction offense. *See Lowenfield v. Phelps*, 484 U.S. 231, 243-44 (1988) (the fact that aggravating circumstance duplicates an element

24

1    of the crime does not make a sentence constitutionally infirm). Here, the California Court of

2    Appeal concluded that if the elements of felony-murder special circumstance under Cal. Pen. Code

3    § 190.2(a)(17) duplicate the elements of felony murder for non-killer accomplices, that duplication

4    is not unconstitutional. That is a reasonable application of *Lowenfield*. Because the state court's

5    rejection of this claim was not contrary to, nor an unreasonable application of clearly established

6    Supreme Court law, Petitioner is denied relief on Claim No. 6.

7                      **7. Cruel and Unusual Punishment**

8         In Claim No. 7, Petitioner contends that his sentence of life without parole constitutes cruel

9    and unusual punishment under the Eight Amendment. Dkt. No. 1 at 43. The California Supreme

10    Court summarily denied this claim. The California Court of Appeal rejected this claim as follows:

> 11    Defendant was 21 years old at the time he committed the charged
> 12    crimes. He maintains that, given his relative youth, the imposition of
>      a life without parole (LWOP) sentence constituted cruel and unusual
> 13    punishment in violation of the federal and state constitutions. (U.S.
>      Const., 8th Amend.; Cal. Const., art. I, § 17.)
> 14
>      . . .
> 15
>      "The Eighth Amendment's prohibition of cruel and unusual
> 16    punishment 'guarantees individuals the right not to be subjected to
>      excessive sanctions.' [Citation.] That right ... 'flows from the basic
> 17    "precept of justice that punishment for crime should be graduated and
>      proportioned" ' to both the offender and the offense. [Citations.]"
> 18    (*Miller v. Alabama* (2012) 567 U.S. 460, 469 (*Miller*).) "'[T]he
>      concept of proportionality is central to the Eighth Amendment,'" and
> 19    is viewed "less through a historical prism than according to '"the
>      evolving standards of decency that mark the progress of a maturing
> 20    society."' [Citations.]" (*Ibid*.)
> 21    In *Miller*, the United States Supreme Court held that mandatory life-
>      without-parole sentences for juveniles violate the Eighth
> 22    Amendment. (*Miller*, *supra*, 567 U.S. at p. 470.) The court reasoned
>      that juveniles "are constitutionally different from adults for purposes
> 23    of sentencing ...[b]ecause juveniles have diminished culpability and
>      greater prospects for reform, [making them] ... 'less deserving of the
> 24    most severe punishments.' [Citation.]" (*Id*. at p. 471.) The court
>      noted "three significant gaps between juveniles and adults. First,
> 25    children have a ' "lack of maturity and an underdeveloped sense of
>      responsibility," ' leading to recklessness, impulsivity, and heedless
> 26    risk-taking. [Citation.] Second, children 'are more vulnerable ... to
>      negative influences and outside pressures,' including from their
> 27    family and peers; they have limited 'contro[l] over their own
>      environment' and lack the ability to extricate themselves from
> 28    horrific, crime-producing settings. [Citation.] And third, a child's
>      character is not as 'well formed' as an adult's; his traits are 'less fixed'

United States District Court
Northern District of California

25

and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' [Citation.]" (*Ibid*.)

Defendant urges us to extend *Miller's* reasoning to this case on the theory that 21-year-olds—like juveniles—lack of maturity, have an underdeveloped sense of responsibility, and are particularly vulnerable to negative influences. He points to research (from outside the appellate record) showing that the brain continues to develop beyond the age of 18, such that even people in their early twenties lack full neurological maturity.

The Supreme Court acknowledged similar points in *Roper v. Simmons* (2005) 543 U.S. 551, 574, noting that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach." Nevertheless, the court concluded that "a line must be drawn" for purposes of the Eighth Amendment and the court drew that line at "the point where society draws the line for many purposes between childhood and adulthood"—age 18. (*Roper v. Simmons*, *supra*, at p. 574.) Decisions of the United States Supreme Court on questions of federal constitutional law are binding on this court. (*People v. Fletcher* (1996) 13 Cal.4th 451, 469, fn. 6.) Accordingly, we are compelled to reject defendant's argument that mandatory LWOP sentences for 21-year-olds violate the Eighth Amendment. (*See People v. Perez* (2016) 3 Cal.App.5th 612, 617 [declining to extend reasoning of *Miller* to 20-year-old defendant].)

*Alvarez*, 2020 WL 1950872, at *17–18.

The California Court of Appeal's rejection of Petitioner's claim alleging cruel and unusual punishment under the Eighth Amendment was not objectively unreasonable. The Supreme Court has issued three significant cases about the Eighth Amendment's prohibition on cruel and unusual punishment as it applies to juvenile offenders. In *Roper v. Simmons*, 543 U.S. 551, 578 (2005), the Supreme Court held that the Eighth Amendment forbids the "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." In *Graham v. Florida*, 560 U.S. 48, 82 (2010), the Supreme Court held that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." And in *Miller v. Alabama*, 567 U.S. 460, 465 (2012), the Supreme Court held that "mandatory life without parole [sentences] for those under the age of 18 at the time of their crimes violate[] the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" But nothing in *Miller*, *Graham*, or *Roper* precludes a sentence of life without parole sentence for an adult offender, even a young person like Petitioner. The Supreme Court recognized in *Roper* that a

bright line is drawn, defining eighteen-years-old as the age of adulthood: "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood." 543 U.S. at 574.

Petitioner argues that "[u]ntil a person reaches his mid-twenties, neurological immaturity limits a young person's ability to . . . make reasoned decisions." Dkt. No. 1 at 45. It is true that courts empathize with the inherent oversimplification inherent in the bright-line age of adulthood rule. *See Roper*, 543 U.S. at 574 ("The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token some under 18 have already attained a level of maturity some adults will never reach."); *People v. Gutierrez*, 58 Cal. 4th 1354, 1380 (Cal. 2014) ("'The qualities that distinguish juveniles from adults do not disappear when an individual turns 18 . . . [but] that is the line the high court has drawn in its Eighth Amendment jurisprudence.") (internal citation omitted). But the line of adulthood has been clearly drawn at eighteen by the Supreme Court, and thus, as the state appellate court reasonably concluded, Petitioner was not improperly sentenced because he was only twenty-one at the time he participated in the murder of G.O. The state courts' decision denying this claim was neither contrary to nor an unreasonable application of Supreme Court case law. Claim No. 7 is denied.

### 8.  Cumulative Error

In his final claim for relief, Petitioner contends that the cumulative errors of the claims raised in this petition entitle him to relief. The California Supreme Court summarily denied this claim. The California Court of Appeal rejected this claim as follows:

> Defendant contends that the cumulative effect of the errors he asserts was to deprive him of his due process rights. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.'" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) We have assumed a single error—that the prosecutor committed misconduct by urging a false inference—so there are no errors to cumulate.

*Alvarez*, 2020 WL 1950872, at *18.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution.)  Cumulative error is more likely to be found prejudicial when the government's case is weak.  *See Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).  However, where only one (or no) constitutional errors exist, nothing can accumulate to the level of a constitutional violation.  *U.S. v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000) ("one error is not cumulative error").  Here, Petitioner has failed to demonstrate cumulative error from the claims raised in this Petition.  This claim for habeas relief is DENIED.

### III.     CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability will not issue because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the United States Court of Appeals for the Ninth Circuit.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: 7/13/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California